NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAY 10 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| OSCAR LOYA-LEON,<br><br>                    Petitioner,<br><br>  v.<br><br>MERRICK B. GARLAND, Attorney<br>General,<br><br>                    Respondent. | No.   21-1352<br><br>Agency No. A073-445-689<br><br>MEMORANDUM* |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 10, 2023
Pasadena, California

Before:  FLETCHER, BERZON, and MILLER, Circuit Judges.
Partial Concurrence and Partial Dissent by Judge MILLER.

Oscar Loya-Leon, a citizen of Mexico, petitions for review of the Board of

Immigration Appeals' ("BIA") dismissal of his appeal from the immigration

judge's ("IJ") denial of his applications for asylum, withholding of removal under

the Immigration and Nationality Act ("INA") and the Convention Against Torture

---

     *     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

1

("Convention"), and deferral of removal under the Convention. We grant the petition in part and deny it in part.

1. The agency did not abuse its discretion in concluding that Loya-Leon was ineligible for asylum and withholding of removal because he was convicted of a particularly serious crime. *See* 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii); 8 C.F.R. § 1208.16(d)(2). Although the IJ recited the reasons Loya-Leon's drug conviction could be considered "inherently particularly serious," she went on expressly to apply the required *Matter of Frentescu,* 18 I. & N. Dec. 244 (BIA 1982), factors. The BIA then adopted and affirmed the IJ's analysis under *Matter of Burbano*, 20 I. & N. Dec. 872, 874 (BIA 1994). *See Abebe v. Gonzales*, 432 F.3d 1037, 1040–41 (9th Cir. 2005) (en banc). As the agency applied the correct analysis, we deny the petition as to Loya-Leon's claims for asylum and withholding of removal under the INA and the Convention.

2. Loya-Leon did not fail to exhaust the arguments made in this court concerning the IJ's adverse credibility determination and treatment of his expert declaration. The BIA adopted and affirmed the IJ's decision under *Burbano*. The BIA's adoption of an IJ's decision addressing the issues raised in this court satisfies the exhaustion requirement. *See Abebe*, 432 F.3d at 1040–41.

2

3. The BIA and IJ erred in determining that Loya-Leon's declaration was entirely not credible. Remand is therefore required on the merits of Loya-Leon's application for deferral of removal under the Convention.

a. The adverse credibility determination rested on the IJ's finding that Loya-Leon's expert made an "assessment . . . that the respondent is unreliable when it comes to recalling past events." The expert never described Loya-Leon as "unreliable." The expert indicated that Loya-Leon has difficulties "assess[ing] the intentions of others"; that "[h]e may need more time to respond to questions or to be asked questions repeatedly" because his current medication "causes him to at times have difficulty concentrating and difficulties with his memory"; and that during the evaluation his "account of the events he experienced and his reactions to them were not consistently coherent," as he has "difficulties presenting a logical and organized account of his life." These opinions do not support a conclusion that when Loya-Leon *is* able to coherently recount past events, his account in its entirety is not credible.

The expert identified aspects of Loya-Leon's account that were hallucinatory or delusional. But the expert opined that other aspects of his account are likely *not* delusional, concluding that Loya-Leon "was likely threatened with death, robbed and fired consistently due to the visible symptoms of his mental illness while in Mexico," including by people who "may have been involved in organized crime."

3

The IJ accepted that the expert was qualified in the field of mental disorders and their symptoms, but did not acknowledge or consider the expert's actual mental health conclusions, which included her assessment of which aspects of Loya-Leon's account were not delusional. Although the IJ could ultimately conclude that the expert's opinions are unpersuasive, the IJ may not base the adverse credibility finding on a determination of complete unreliability the expert never made.

b. The IJ concluded that Loya-Leon's declaration was not credible in part because his declaration was inconsistent with his 2016 credible fear interview, but that finding is not supported by substantial evidence. Both Loya-Leon's declaration and the record of his 2016 interview reflect his allegation that criminal groups in Mexico attempted to recruit him.

c. The credibility determination was further flawed because the IJ did not consider the "totality of the circumstances," § 1158(b)(1)(B)(iii), including whether other evidence in the record corroborated Loya-Leon's account. *Kumar v. Garland*, 18 F.4th 1148, 1151 (9th Cir. 2021) (quoting § 1158(b)(1)(B)(iii)).

Asserting that "the declaration from [the expert] is derived from the respondent's own unreliable account and statements," the IJ declined to consider whether the expert declaration corroborated Loya-Leon's assertion that he was harmed by police and criminal groups in the past. Substantial evidence does not

4

support the IJ's reason for rejecting the bulk of the expert declaration. The expert's declaration did rely in part on Loya-Leon's own reports. But it also relied on her own direct observations of his behavior during a clinical interview, her review of his psychiatric treatment records from his detention at Otay Mesa, as well as her expert assessment of what types of behaviors or statements would tend to reflect delusion or hallucination. The expert declaration tended to corroborate Loya-Leon's claims because it provided evidence that he is unable to keep his delusional thoughts to himself and is likely to share them with others; the symptoms of his mental illness are visible to others and so are likely to draw negative attention from others; his symptoms are unlikely to improve and instead will likely worsen if he is removed to Mexico; and his reported past difficulties are consistent with what is to be expected for a person with schizophrenia.

Similarly, the IJ erred in declining to consider whether the country conditions evidence tended to corroborate Loya-Leon's account that he was previously targeted by police and criminal groups. A relevant factor in assessing an applicant's credibility is "the consistency of [the applicant's] statements with other evidence of record (*including the reports of the Department of State on country conditions*)." 8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added).

In concluding that Loya-Leon did not corroborate his declaration, the IJ did not address key country conditions evidence supporting his allegation that he was

5

in the past, and would be in the future, singled out by police and criminal groups due to the visible symptoms of his mental illness or his homelessness. For example, the State Department's 2019 Mexico Human Rights Report stated that "violence targeting persons with disabilities" by "police, military, and other government officials and illegal armed groups" is a "significant human rights issue[]" in Mexico. Impunity for such abuses "remained a problem, with extremely low rates of prosecution for all crimes." Another report on adults with mental disabilities indicated that Mexican police target homeless people.

The country conditions evidence also tended to corroborate Loya-Leon's claim that when he was arrested by the police, they beat him or other prisoners. For example, a January 2018 country report stated that a 2016 survey of over 64,000 people incarcerated in prisons throughout Mexico found that "57.8 percent of the prison population reported having suffered some type of physical violence at the time of their arrest," and significant proportions of those surveyed reported being hit or kicked, receiving electrical shocks, or being choked, held underwater, or smothered. An April 2016 study found that 80 percent of detained persons "showed bodily injuries possibly due to ill treatment and torture."

\* \* \* \*

We therefore remand Loya-Leon's claim for protection under the Convention to the agency for consideration of whether, under the totality of the

6

circumstances, his declaration should be credited for purposes of assessing the likelihood he would be tortured in the future, given that his declaration was not in fact inconsistent with his 2016 credible fear interview, and in light of the corroborating evidence in the expert declaration and country conditions reports.[1]

4. The IJ and BIA also failed to give reasoned consideration to Loya-Leon's other evidence concerning his likelihood of future torture. "[A]ll evidence relevant to the possibility of future torture shall be considered" by the agency, 8 C.F.R. § 1208.16(c)(3), and the failure to discuss "highly probative or potentially dispositive evidence" is legal error. *Flores Molina v. Garland*, 37 F.4th 626, 632 (9th Cir. 2022) (quoting *Cole v. Holder*, 659 F.3d 762, 772 (9th Cir. 2011)).

As noted, the IJ failed to take into account relevant aspects of the expert declaration concerning the likelihood that Loya-Leon would be perceived and singled out as mentally ill. Further, the IJ did not consider the evidence in the country reports concerning Loya-Leon's future risk of being singled out by police or criminal groups due to his disability or because of homelessness; the risk that the police would physically abuse him; or the problem of impunity for abuses against persons with disabilities.

---

[1] Substantial evidence supports the agency's conclusion that, assuming Loya-Leon's declaration is credited, the *past* harms he suffered did not rise to the level of torture. *See, e.g.*, *Vitug v. Holder*, 723 F.3d 1056, 1066 (9th Cir. 2013).

7

Although the IJ stated generally that she considered "all evidence in the record," the use of "a catchall phrase does not suffice" when "there is any indication that the [agency] did not consider all of the evidence before it." *Cole*, 659 F.3d at 771–72; *see also* 8 C.F.R. § 1208.16(c)(3). Here, the IJ repeatedly stated that Loya-Leon had failed to show a particularized risk of torture or a risk any greater than that faced by "the general population in Mexico." But the expert and country conditions evidence is highly probative of the likelihood that Loya-Leon has a *particularized* risk of torture based on the visible symptoms of his mental disability, his tendency to share his delusional thoughts with others, and his likely homelessness. *See, e.g.*, *Guan v. Barr*, 925 F.3d 1022, 1034 (9th Cir. 2019). We therefore remand for the agency to consider the whole record in assessing Loya-Leon's future risk of torture.[2]

Each party shall bear its own costs. *See* Fed. R. App. P. 39(a)(4).

**PETITION DENIED IN PART, GRANTED IN PART, AND REMANDED.**

---

[2] We reject Loya-Leon's challenge to the agency's conclusion that he did not establish he would be likely to be tortured in a Mexican psychiatric institution. He points to no record evidence that the harms he would face are specifically intended to inflict severe pain and suffering. *See Villegas v. Mukasey*, 523 F.3d 984, 989 (9th Cir. 2008).



*Loya-Leon v. Garland*, No. 21-1352

MILLER, Circuit Judge, concurring in part and dissenting in part:

Congress has directed us to accept the agency's factual findings, including adverse credibility determinations, "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021). Loya-Leon has not met that standard, so I would deny the petition for review in its entirety.

The immigration judge, whose decision the Board adopted, wrote that she gave "full evidentiary value to the assessment of [the expert] that [Loya-Leon] is unreliable when it comes to recalling past events." That was a reasonable interpretation of the expert's testimony. The expert observed that "many of [Loya-Leon's] perceptions of his experiences since the onset of his symptoms since 2005 are influenced by delusional thinking," and that "Loya Leon's account of the events he experienced and his reactions to them were not consistently coherent." The immigration judge reasonably understood those statements to mean that, even if there may be some truth in Loya-Leon's recollections, they cannot be taken at face value, and they are thus "unreliable."

Although the expert opined that certain aspects of Loya-Leon's account were "likely" true, the immigration judge was not required to accept that opinion as long as she "state[d] 'in the record why the testimony was insufficient to establish the

1

probability of torture.'" *Castillo v. Barr*, 980 F.3d 1278, 1283 (9th Cir. 2020) (quoting *Cole v. Holder*, 659 F.3d 762, 772 (9th Cir. 2011)). The immigration judge did just that, explaining that the expert's conclusions about Loya-Leon's experiences were based on his own reports, so they were unreliable for the same reason as the reports themselves. To be sure, the expert also based her declaration on her own observations of Loya-Leon's behavior during an interview, her review of his psychiatric treatment records, and her knowledge of schizophrenia and its symptoms. But the expert drew on her observations, research, and background knowledge in order to diagnose Loya-Leon's illness. She did not explain how any of those things equipped her to accurately separate fact from fiction in Loya-Leon's reports of his experiences in Mexico. The expert was not present with Loya-Leon in Mexico, and her expertise—in mental disorders and their symptoms, not recent Mexican history—gave her no apparent basis for assessing what happened to him there. Substantial evidence thus supports the agency's conclusion that Loya-Leon's reports, and the aspects of the expert's declaration derived from them, were unreliable.

The agency did not err in not saying more about evidence of country conditions because that evidence was neither "highly probative" nor "potentially dispositive." *Cole*, 659 F.3d at 772; *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less

2

than ideal clarity if the agency's path may reasonably be discerned."). To the extent that any country conditions evidence suggested that Loya-Leon might be targeted by criminal groups in Mexico, it was beside the point because the immigration judge found insufficient evidence that the Mexican police would acquiesce in torture at the hands of criminal groups. As to the threat of torture by the police, there was scant evidence suggesting that Loya-Leon faces a particularized threat of torture. The State Department's 2019 Mexico Human Rights Report does not say that government officials target people with disabilities. Rather, it notes reports of government officials participating "in unlawful or arbitrary killings, forced disappearance, and torture," and then, separately, notes generalized "violence targeting persons with disabilities," without identifying the source of such violence. And although the Report notes that "[i]mpunity for human rights abuses remained a problem, with extremely low rates of prosecution for all crimes," we have held that "evidence that a government has been generally ineffective in preventing or investigating criminal activities [does not] raise an inference that public officials are likely to acquiesce in torture." *Garcia-Milian v. Holder*, 755 F.3d 1026, 1034 (9th Cir. 2014).

Finally, although violence against prisoners in Mexico is apparently widespread, the immigration judge found that Loya-Leon had not shown that it is more likely than not that he would become a prisoner or that police would torture

him in the course of making an arrest. The immigration judge noted the chain of events that would have to take place for Loya-Leon to be tortured by police and concluded that "[a]ll of these are a series of suppositions that [Loya-Leon] has failed to show is more likely than not to occur." In making that determination, the immigration judge did not ignore any highly probative evidence about the risks that Loya-Leon might face were he to become homeless. The record does contain some evidence that the police place homeless people in psychiatric institutions, but Loya-Leon has cited no country conditions evidence suggesting that the police target the homeless for violence or imprisonment. And as the court observes, Loya-Leon has not established that he is likely to be tortured if placed in a psychiatric institution. Because substantial evidence supports the conclusion that Loya-Leon is not more likely than not to be arrested or imprisoned by police, the agency did not err by not expressly addressing the data on violence against Mexican prisoners.